IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Jan L. Day, )
 )  C.A. No. 6:09-1041-HMH
        Plaintiff, )
 )
   vs. )
 )  **OPINION AND ORDER**
The Hartford Life Insurance Co., BB&T )
Corporation, and the BB&T Corporation )
Group Long Term Disability Insurance )
Plan, )
 )
        Defendants. )

This matter is before the court for review of the claim administrator's decision to deny long-term disability ("LTD") benefits to Jan L. Day ("Day") under an LTD insurance policy ("Policy") governed by ERISA.[1] The Policy is insured and administered by Hartford Life and Accident Insurance Company ("Hartford").[2] Day seeks LTD benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) and attorney's fees and costs pursuant to 29 U.S.C. § 1132(g). (Joint Stipulation ("J.S.") ¶ 1.) The parties[3] have filed a joint stipulation and memoranda in support of judgment pursuant to the court's Specialized Case Management Order for ERISA benefits cases. The

---

[1] Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.

[2] Hartford notes that it has been incorrectly identified by Day as Hartford Life Insurance Company. (Defs.' Mem. Supp. J. 1.)

[3] BB&T Corporation was dismissed as a party on May 18, 2009.

1

parties agree that the court may dispose of this matter consistent with the joint stipulation and memoranda. (Id. ¶ 8.)

However, the parties disagree as to whether Hartford, "abused its discretion, under the appropriate standard of review," in denying Day's LTD benefits. (Id. ¶ 7.) The parties also "disagree about the appropriate standard of review." (Id.) For the reasons set forth below, the court affirms Hartford's denial of LTD benefits.

## I. Factual and Procedural History

Day's claim arises under a group disability policy that was issued by Hartford to Day's former employer, BB&T Corporation ("BB&T"). Day was employed by BB&T as a Mortgage Lending Quality Control Specialist until early February 2004 when she ceased working due to lower back and hip pain. (Pl. Mem. Opp'n J. 1.) "Hartford approved LTD benefits under the Policy's 'own occupation' definition of disability for the period beginning August 9, 2004 and paid [Day] benefits for 36 months." (Defs. Mem. Supp. J. 2.) "Hartford denied [Day's] claim for benefits under the Policy's 'any occupation' definition of disability which became effective August 9, 2007." (Id.) The decision was upheld on appeal and became final on June 23, 2008. (R. at 58-63.)

Day's injuries arose from an automobile accident on March 15, 2000. (Id. at 861.) On April 7, 2000, Day visited Melinda Erlewine, a physical therapist, complaining of low back pain because of the accident. (Id. at 866.) Day continued with physical therapy until she was discharged on July 31, 2000. (Id. at 863.) Day was advised to be consistent with her home exercise program and return to regular activity slowly. (Id.) On November 20, 2001, Day began seeking treatment from Dr. Robert LeBlond ("Dr. LeBlond") of Upstate Medical Rehabilitation,

2

PC. (R. at 817.) During Day's initial visit, Dr. LeBlond noted that Day's "EMG/nerve conduction studies of the lower extremities was normal. MRI of the lumbar spine with degenerative disk at L3-4 with facet hypertrophy and mild 11 thesis of L4 and L5 and moderate stenosis of the L4-5 spaces associated with the facet changes." (Id.) Additionally, Dr. LeBlond noted that Day was "intact from a neurologic standpoint. The pain appears musculoskeletal in nature . . . . Differential diagnosis would include spinal stenosis, however her symptoms do not fit this. Her conservative management is best option." (Id.) As a result, Dr. LeBlond placed Day in physical therapy using a manual therapist to correct her pelvis obliquity and develop a good home exercise program. (Id. at 818.)

On March 18, 2003, Day visited Dr. Michael Crawley ("Dr. Crawley"), a neurologist, who suggested that Day "has exhausted all conservative measures" and should consider "a posterior lateral interbody fusion." (Id. at 827.) On July 23, 2003, Dr. Regis Haid, Jr. ("Dr. Haid"), a neurosurgeon, performed an L4-L5 transforaminal interbody fusion on Day. (R. at 873.) Day returned to Dr. LeBlond on August 6, 2003, for staple removal. Day reported that the lumbar fusion "helped somewhat although she is having pain going down into her lower extremities." (Id. at 799.) On September 4, 2003, Day informed Dr. LeBlond that "she is slowly improving [and] is pleased with her progress. She continues to wear her brace and will until she has a follow up with Dr. [Haid]. She is using OxyContin and oxycodone which help with her pain. No side effects." (Id. at 798.) Dr. LeBlond continued Day with her medication and recommended home exercise. (Id.)

On November 12, 2003, Day met with Dr. Ruffin Stephenson ("Dr. Stephenson") for an evaluation of pain. (Id. at 828.) Dr. Stephenson noted that Day

3

has some pain in the trochanteric area with manipulation of the hip bilaterally. Good pulses, no edema, no varicosities. She goes from supine to sitting slowly and carefully due to the back problem. She stands slowly. She walks with no difficulty. Stands on her heels and toes with no difficulty though I didn't check back motion. She is mildly tender in the typical tender points of FMS [fibromyalgia syndrome] at the current time.

(R. at 829.) Dr. Stephenson hypothesized that "most likely [Day] is in the chronic musculoskeletal pain category and FMS is probably what this patient has." (Id. at 830.)

Day returned to Dr. LeBlond on January 2, 2004. Day noted that she "continues to have low back pain, which is aggravated with prolonged sitting, standing, bending, or lifting." (Id. at 666.) On January 14, 2004, Day visited Dr. LeBlond and complained of difficulty with working full-time. Dr. LeBlond "encouraged her to continue working until [her] next visit" and if she was unable to do that, change to part-time. (Id. at 665.) Dr. LeBlond prepared an Attending Physician's Statement ("APS") of Disability for Day's LTD claim on January 24, 2004. Dr. LeBlond's primary diagnosis was "chronic low back pain." (Id. at 712.) No secondary condition was listed.

On February 11, 2004, Dr. LeBlond noted that Day "is having an exacerbation with her work schedule and I do not believe that she can keep that job . . . . I feel she is disabled and qualifies for [LTD]." (R. at 664.) Hartford approved Day's LTD benefits claim on February 24, 2005, under the Policy's own occupation definition of disability. (Defs. Mem. Supp. J. 9.) "Hartford advised [Day] that benefits under that definition would be provided for no more than thirty-six months, after which [she] must satisfy the 'any occupation' definition to qualify for continued benefits." (Id.)

Day's counsel sent her to Dr. William W. Stewart ("Dr. Stewart"), an associate professor of rehabilitation counseling, certified rehabilitation counselor, and vocational evaluator, for a vocational and rehabilitation evaluation on July 19, 2004. (R. at 775.) Dr. Stewart noted that

> Day identified aching and burning pains and stiffness in her lower back/spine and down into her tailbone area, burning and aching pains into her left buttocks and hip and down the outside back of her upper left leg, pins and needles sensations in the back of her upper left leg, burning pains in the front of her left hip and the outside of her upper left leg, burning pains in the front of her left hip and the outside of her upper left leg, aching pains in her groin areas, aching pains in her right hip, aching pains in her right knee, aching pains in the top of both feet, and aching pains and stiffness in the bottom of both feet. She indicated that her worst symptoms/problems are in her lower back/spine and left leg; and, that she experiences significant increases in symptoms/problems with sitting, standing, walking, bending, stooping movement of her body, and with added/increased emotional/mental stress.

(Id. at 780.) Dr. Stewart concluded that Day

> has not been job ready or placeable since she last worked, or last tried to continue working as best she could, and that . . . she remains unable to work and vocationally disabled because of these medical/health conditions and ongoing problems and limitations, and in need of medical pain management care and psychiatric care [and] without significant improvement in her overall condition or conditions, [Day's] prognosis for successful vocational rehabilitation to some kind of lighter, alternative work or job is quite poor; that is, most likely she will remain unable to work and vocationally disabled because of these medical/health conditions/injuries and ongoing problems and limitations.

(Id. at 781.)

Day continued to schedule follow-up appointments with Dr. LeBlond, with the record showing visits on December 15, 2004, February 17, 2005, May 23, 2005, August 3, 2005, October 27, 2005, February 6, 2006, and July 5, 2006. (Id. at 571, 578, 642, 643, 645, 658.) On July 5, 2006, Day reported the oxycodone improved her lower back pain without any side effects

5

and she was coping "fairly well" and did not need to see any other physicians. (Id. at 571.) Dr. LeBlond noted that Day had "better pain control." (R. at 571.)

On March 3, 2006, Day was awarded Social Security Disability ("SSD") benefits. On August 30, 2006, Day completed a Clamaint's Questionnaire ("CQ"). She reported "low back pain with increased numbness, pain in legs. I cannot sit or stand for any period of time. Tire very easily; mentally 'fuzzy'; physically weak; joint and muscle pain; trouble sleeping; depression." (Id. at 593.) Dr. LeBlond submitted an updated APS on November 6, 2006. His primary diagnosis remained unchanged, stating that Day suffered from chronic back pain. No secondary diagnosis was made. Dr. LeBlond also reported that Day was unable to stand or walk for more than 15 minutes, she could not sit for a prolonged amount of time, she could not lift more than 15 pounds, and she could drive. (Id. at 566.)

Day completed another CQ on February 27, 2007. She reported having "severe low back pain, fibromyalgia, [and] depression." (Id. at 551.) On March 22, 2007, she reported to Dr. LeBlond that her "pain is fairly well controlled." (Id. at 514.) On March 23, 2007, Hartford sent Dr. LeBlond questions related to Day's ability to function. In the area asking whether Day was capable to perform full-time sedentary work, Dr. LeBlond marked "no." (R. at 513.) Dr. LeBlond explained that Day has severe chronic pain and has failed all attempts at treatment. (Id.)

On May 15, 2007, Hartford referred Day to Tracy Rogers-Hall ("Rogers-Hall"), a Registered Physical Therapist, of Proaxis Therapy for a Functional Capacity Evaluation ("FCE"). The FCE was conducted on June 5, 2007. (Id. at 496.) Rogers-Hall concluded that based on the FCE,

> Day can function in a light physical demand category with a maximum waist to overhead lift of 20 lbs, waist to knee level of 30 lbs, knuckle to shoulder level of 30 lbs and floor to knuckle level of 30 lbs. Maximum push and pull was measured at 50 lbs, carrying was measured at 30 lbs in both hands, 20 lbs in the right hand and 20 lbs in the left hand.

(Id.). Additionally, Rogers-Hall noted that while Day complained of pain during the testing, she did not appear to be in severe distress. Day "demonstrated good body mechanics, good gait and ROM [range of motion], good manual coordination, average finger coordination, a high correlation between verbal complaints and behavior and gave an overall good effort. [Day] can function in a light physical demand category." (Id. at 497.) Hartford requested that Dr. LeBlond comment on the FCE on June 14, 2007. Dr. LeBlond responded on June 20, 2007, stating in part,

> I have reviewed the FCE . . . and while it shows that she can do light physical work[,] I however beg to differ. I have treated [Day] for some time. She has significant back pain which requires frequent changes in position as well as frequent rest breaks. She is on various medications to help control her pain which cause sedation and impaired concentration. I do not believe that she can return to work.

(R. at 480.)

Hartford requested a peer review of Day's records on June 28, 2007, from Medical Advisory Group, LLC ("MAG"). Dr. F. B. Dibble, Jr. ("Dr. Dibble"), a family medicine practitioner, reviewed Day's medical records in order to provide his report and analysis. Among other things, Dr. Dibble noted that Dr. LeBlond did not agree with Roger-Hall's assessment, "but can offer only [Day's] self-reported subjective symptomatology to support his opinion." (Id. at 469.) Ultimately, Dr. Dibble concluded that

> Day has a chronic pain syndrome based on degenerative joint and disc disease of the lumbar spine. It is my medical opinion with a reasonable degree of medical certainty that Ms. Day is not restricted from full time employment. She has had a formal Physical Capacities Evaluation, and I

7

> have no information upon which to base any disagreement with the
> findings of that examination. She has been carefully and thoroughly
> treated, and it is my opinion that there are no additional tests or treatments
> that would be appropriate for Ms. Day, as she has been said to be doing
> very well on her current treatment program.

(Id.) Hartford provided Dr. LeBlond with a copy of Dr. Dibble's report seeking his comments on June 24, 2007. On July 30, 2007, Dr. LeBlond responded that he disagreed with the conclusions of Dr. Dibble because Day suffered from severe back pain which prevents her from work and concentration. (Id. at 417.)

On August 9, 2007, a Hartford Rehabilitation Clinical Case Manager prepared an Employability Analysis of potential occupations that Day could perform based on the results of the FCE and Day's education and work experience. (Id. at 425.) As a result of the OASYS (Occupational Access System) search, Hartford identified six occupations that would provide Day with the requisite wage potential–auditor, credit analyst, manager for credit and collection, loan review analyst, loan officer, or loan interviewer. (R. at 425.) Each of the occupations are sedentary. On August 17, 2007, Hartford denied Day's claim for LTD benefits under the "any occupation" definition of disability.

Day visited Dr. LeBlond on August 27, 2007, reporting aching pain that is "constant and worse with prolonged standing, sitting, walking, bending, lifting, [and] housework. It is better with rest and pain medications. Pain ranges from a 5 or 6 to a 9 or 10." (Id. at 325.) Dr. LeBlond encouraged her to continue to seek disability benefits. (Id.) On April 15, 2008, Dr. LeBlond submitted a written statement in support of Day's appeal of her denial of LTD benefits. (Id. at 316-21.) Dr. LeBlond wrote:

> Since her surgery, Ms. Day has suffered daily with severe low back pain, which radiates into her left lower extremity along [ ] down the L4-5 nerve distribution. Ms. Day also suffers from bi-lateral degenerative changes in her hips. She is physically unable to stand or sit for any length of time. Ms. Day requires oxycodone, a narcotic pain medication, as well as Soma, on a daily basis. These medications cause sedation and impaired concentration and affect judgment.
>
> . . . .
>
> Due to her severe back pain, and the need for narcotic pain medications, I do not believe that Ms. Day has the necessary physical or mental endurance and capacity to perform any work. Even with the narcotic pain medications, I do not believe that Ms. Day has the necessary physical or mental endurance and capacity to perform any work. Even with the narcotic pain medications, Ms. Day's pain level makes concentration difficult. The narcotic pain medications cause sedation and impaired concentration. The daily use of narcotic pain medication affects [Day's] judgment and decision-making capabilities. Therefore, I believe that Jan Day is totally disabled from performing even sedentary work.

(Id. at 316, 321.)

Day formally appealed her denial of benefits on April 17, 2008. (R. at 304.) Hartford sent Day's medical records for additional peer review through Reliable Review Services ("RSS") on May 28, 2008. RSS selected two physicians to review Day's records for peer review, Dr. Denise Davis ("Dr. Davis"), a board-certified physical medicine and rehabilitation pain management physician and Dr. Vernon Mark ("Dr. Mark"), a board certified neurological surgeon. (Id. at 148-56.) In her assessment, Dr. Davis detailed her objective findings based on her review of Day's medical records. She then concluded that

> based on the objective physical examination findings in the file and the objective medical [records] including MRI's and x-rays, [Day] could do sedentary work . . . . Although she was found on 06/2007 on a Functional Capacity Evaluation to be able to do light capacity work, she could not do this on a sustained basis, taking into [consideration] her pain complaints. In my medical opinion, there is no documented evidence of impairment to

9

> [Day] as a result of her medications. Dr. Le[B]lond repeatedly
> documented no side effects from the medications. At no time did he
> document significant cognitive side effects as a result of the medications.
> Additionally, none of the other physicians documented any issues with
> side effects . . . . [T]he evidence does not support cognitive occupational
> limitations due to the pain and the medication because, as stated above,
> Dr. Le[B]lond repeatedly documented there were no side effects from the
> medication, and [Day] was repeatedly characterized as being alert and
> oriented . . . on physical examination by her health care providers.

(Id. at 153-54.) Dr. Mark also concluded that Day is able to perform sedentary work on a full-time basis. (Id. at 156.) Dr. Mark stated

> [f]rom an objective neurosurgical point of view, following the L4/L5
> decompression and fusion, I did not find neurological evidence of focal
> neurological disease. Furthermore, after the fusion the severe stenosis that
> was present preoperatively was not present postoperatively. [Day] not only
> had a normal neurological examination, she also had a normal EMG and
> nerve conduction study, and for that matter, from an objective point of view
> a fairly normal [FCE]. The fact that she had degenerative changes in her
> lumbar spine at age 57 would not distinguish her from millions of her
> fellow Americans over the age 50 who go about their full-time work tasks.

(Id. at 156.) Dr. Mark also noted that the "objective medical evidence does not support cognitive occupational limitations due to [Day's] pain and medications. I did not find objective tests of neuropsychological function." (R. at 155.)

On June 16, 2008, Hartford referred Day's appeal for additional vocational review to determine whether occupations identified in the August 9, 2007 Employability Analysis remained appropriate. According to the June 2008 Employability Analysis, the August 2007 Analysis continued to be appropriate as the six occupations previously listed were all sedentary occupations. (Id. at 121.) Hartford denied Day's appeal on June 23, 2008, stating that it

> realize[s] that Ms. Day continues to experience chronic pain. However, in
> order to determine whether she satisfies the definition of Disability
> applicable to her claim as of 8/9/07, we must consider whether her medical
> condition results in functional impairments that prevent her from
> performing the Essential Duties of Any Occupation within her
> qualifications.

(Id. at 63.)

The relevant terms of the Policy are as follows:

a. The Policy's definition of "disability:"

> With respect to All Active Regular Employees with a salary grade lower
> than 19, Disability or Disabled means that during the Elimination Period and
> for the next 36 months you are prevented by:
>
> 1. accidental bodily injury;
> 2. sickness;
> 3. Mental Illness;
> 4. Substance Abuse; or
> 5. pregnancy,
>
> from performing one or more of the Essential Duties of Your Occupation,
> and as a result your Current Monthly Earnings are no more than 80% of
> your Indexed Pre-disability Earnings.
>
> After that, you must be so prevented from performing one or more of the
> Essential Duties of Any Occupation.

(J.S. ¶ 6.) In addition, the Policy defines "Any Occupation" as:

> an occupation for which you are reasonably fitted by education, training or
> experience, and that has an earnings potential greater than an amount equal
> to the lesser of the product of your Indexed Pre-disability Earnings and the
> Benefit Percentage for which you enrolled and the Maximum Monthly
> Benefit shown in the Schedule of Insurance.

(Id.) Lastly, the Policy also provides that Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (Id. ¶ 3.)

11

Day filed the instant action on February 27, 2009, in the Court of Common Pleas of Greenville, South Carolina. Defendants removed the case to this court on April 20, 2009. The parties submitted a joint stipulation on September 25, 2009. Day filed a motion for summary judgment on September 25, 2009. Defendants filed a memorandum in support of judgment on September 25, 2009, and a memorandum in opposition of summary judgment on October 2, 2009. Also on October 2, 2009, Day filed a motion to strike materials not included in the administrative record filed in support of Defendants' memorandum in support of judgment. Defendants filed a memorandum in opposition to the motion to strike on October 15, 2009.

## II. Discussion of the Law

### A. Standard of Review

As an initial matter, the parties disagree about the appropriate standard of review that applies in evaluating Hartford's decision to deny LTD benefits. Day alleges that a modified abuse of discretion standard applies because Hartford has a conflict of interest due to the fact that Hartford "provides insurance coverage to fund benefits for the [Policy, and] also evaluates claims and determines eligibility for benefits." (Pl. Mem. Summ. J. 16.) Defendants argue that an abuse of discretion standard applies. (J.S. ¶ 7.) Under a modified abuse of discretion review

> the court applies the conflict of interest factor . . . to lessen the deference normally given under [the abuse of discretion] standard of review only to the extent necessary to counteract any influence unduly resulting from the conflict . . . . In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict . . . . [T]he court [does not] deviate from the abuse of discretion standard. Instead, the court modifies that abuse of discretion standard according to a sliding scale. The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.

Ellis v. Metro. Life Ins. Co., 126 F.3d 228, 233 (4th Cir. 1997) (internal citations omitted). However, recent case law from the United States Supreme Court and the United States Court of Appeals for the Fourth Circuit suggest that this modified standard of review "create[s] further complexity adding time and expense." Metro. Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2351 (U.S. 2008).

"[W]hen [a] plan['s] language grants the administrator discretionary authority, review is conducted under the familiar abuse-of-discretion standard." Carden v. Aetna Life Ins. Co., 559 F.3d 256, 260 (4th Cir. 2009). However, "the administrator's conflict of interest d[oes] not change the standard of review from the deferential review, normally applied in the review of discretionary decisions, to a *de novo* review, or some other hybrid standard." Id.

> Indeed, . . . the conflict of interest should not lead to special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict. Rather, a conflict of interest becomes just one of the several different, often case-specific, factors to be weighed together in determining whether the administrator abused its discretion.

Id. (internal quotation marks omitted). "[C]onflicts are but one factor among many that a reviewing judge must take into account" in determining whether an administrator abused its discretion. Glenn, 128 S.Ct. at 2351. The court is therefore instructed to "determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together." Id.

Accordingly, the Court of Appeals for the Fourth Circuit has held that "*Glenn* now forecloses our application of [the modified abuse of discretion] rule to curb the discretion given an administrator by a plan." Carden, 559 F.3d at 260.

> As the result of *Glenn*, whenever a plan administrator employs its interpretive discretion to construe an ambiguous provision in favor of its financial interest, that fact may be considered as a factor weighing against the reasonableness of its decision . . . . But this factor . . . is only considered with all of the other factors that may be brought to bear in determining whether the administrator abused his discretion. The weight accorded to this factor will, of course, depend largely on the plan's language and on consideration of other relevant factors.

Id. at 261 (internal citation omitted). As such, the court finds that the proper standard of review in this case is the abuse of discretion standard.

> [There are] eight nonexclusive factors that guide [an] ERISA abuse-of-discretion review: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Id.

When evaluating a plan administrator's decision for abuse of discretion, the court may consider only evidence before the plan administrator at the time of the decision. Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 125 (4th Cir. 1994). The administrator's decision must stand unless unreasonable, even if the court would have reached a different conclusion. Booth v. Wal-Mart Stores Inc. Assoc. Health and Welfare Plan, 201 F.3d 335, 341 (4th Cir. 2000). "Under the abuse of discretion standard, the plan administrator's decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Bernstein v. CapitalCare, Inc., 70 F.3d 783, 788 (4th Cir. 1995) (internal quotation marks and citation omitted). "Substantial evidence . . . is evidence

which a reasoning mind would accept as sufficient to support a particular conclusion . . . [and] consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir. 1984), overruled by implication by, Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003).

### B. Denial of LTD Benefits

For the reasons set forth below, the court finds that Hartford did not abuse its discretion. The record reveals that Day suffers from chronic lower back pain. Day's treating physician, Dr. LeBlond, states that Day is unable to perform any work because of "her severe back pain, and the need for narcotic pain medications . . . [which cause] sedation and impaired concentration." (R. at 321.) Dr. Stewart, the rehabilitation counselor hired by Day's attorney, also concluded that "most likely [Day] will remain unable to work and vocationally disabled." (Id. at 781.)

Drs. Dibble, Davis, and Mark, however, each concluded that based on Day's medical records, it appears that Day is able to perform sedentary work. (Id. at 153-56, 469.) Additionally, Day's FCE revealed that she "demonstrated good body mechanics, good gait and ROM [range of motion], good manual coordination, average finger coordination, a high correlation between verbal complaints and behavior and gave an overall good effort." (Id. at 497.) As a result, the FCE evaluator determined that Day "can function in a light physical demand category." (Id.)

In his letter in support of Day's appeal, Dr. LeBlond notes that Day's medication causes "sedation and impaired concentration." (R. at 480.) Dr. LeBlond's assertion, however, is not supported by the substantial evidence in the record. On numerous occasions Dr. LeBlond specifically indicated that Day experienced "no side effects" from her medication. (Id. at 571, 660, 661, 663, 665, 798.) Moreover, Dr. LeBlond discussed at length Day's use of her

15

medication and his plan to continue her use without any mention of side effects. (Id. at 578, 643, 657, 658, 662, 664.)

The court finds that the process used by Hartford was reasonable. Hartford obtained and relied, in part, on objective information from the FCE as well as an independent peer review prior to denying Day's LTD benefits. Following Day's appeal, Hartford obtained two additional independent reviews of the medical records, both of which supported Hartford's conclusion that she was able to perform sedentary work that fit the "any occupation" definition in the Policy. Additionally, after Drs. Davis and Mark completed their review of the record, Hartford sought an additional Employability Analysis to allow any changes that needed to be made based on the most recent independent reviews.

Unlike in social security disability benefits cases, "ERISA does not impose a treating physician rule, under which a plan must credit the conclusions of those who examined or treated a patient over the conclusions of those who did not." White v. Sun Life Assur. Co. of Canada, 488 F.3d 240, 254 (4th Cir. 2007). Rather, "ERISA . . . require[s] that in order to deny benefits, an insurer must present a basis a reasoning mind would accept as sufficient to support its decision." Id. (internal quotation marks omitted). In determining LTD benefits, "the very judgment of the treating doctor as to the medical necessity of the prescribed treatment is being assessed by the Plan administrator and its medical consultants. To require the Plan to give conclusive weight to the opinion of the treating physician would deprive it of its role in determining medical necessity." Sheppard, 32 F.3d at 126.

"The Fourth Circuit has held that it is not an abuse of discretion for a plan fiduciary to deny disability pension benefits where conflicting medical reports were presented." Elliot v. Sara

Lee Corp., 190 F.3d 601, 606 (4th Cir. 1999); see also Ellis, 126 F.3d at 233-34 (Where decision maker had "before it three separate [independent] reports" which conflicted with treating physician's conclusion, there is "a substantial basis on which an objectively reasonable decision maker could determine that [claimant] was not disabled within the terms of the Plan."). However, "[Hartford] can . . . rely on conflicting reports to terminate benefits, but only if those conflicting reports are substantial." Berger v. Metro. Life Ins. Co., No. AW-08-76, 2009 WL 2366290 at *8 (4th Cir. July 28, 2009). Each independent review performed in Day's case resulted in a conclusion that Day was able to perform full-time work. Moreover, the FCE, also indicated that Day had the physical capability to perform work.

The court must also consider Hartford's conflict of interest in assessing Day's eligibility for LTD benefits. Hartford operated under a conflict of interest because it "serve[d] both as administrator of the plan with discretionary authority to determine entitlement to benefits and to construe disputed terms and as insurer of the plan with responsibility for paying benefits." Carden, 559 F.3d at 260. However, there is no evidence of a pattern of biased decisions by Hartford. As discussed above, Hartford took numerous measures to ensure objectivity by seeking independent reviews of Day's medical records. Hartford also sought Dr. LeBlond's comments after Day's FCE and Dr. Dibble's peer review. Moreover, there is no evidence that Hartford made any unreasonable interpretations of the Policy. As such, the court finds that while Hartford operated under a conflict of interest, the majority of other factors favor a finding that Hartford did not abuse its discretion.

Therefore, after considering the record as a whole, the court concludes that Hartford did not abuse its discretion in denying Day LTD benefits. The court, therefore, affirms Hartford's decision to deny Day LTD benefits.

### C. Day's Motion To Strike

Day filed a motion to strike three exhibits attached to Defendants' memorandum in support of judgment. The court did not rely on any evidence that is not contained within the administrative record in forming its decision. Accordingly, Day's motion to strike is moot.

It is therefore

**ORDERED** that Hartford's decision denying Day LTD benefits is affirmed; it is also

**ORDERED** that Day's motion for summary judgment, docket number 30, is denied as moot; and it is further

**ORDERED** that Day's motion to strike, docket number 36, is denied as moot.

**IT IS SO ORDERED**.

s/Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
November 2, 2009